REENA RAGGI, Circuit Judge,
concurring:
In this case, in which Dwayne Ingram stands convicted of his third felony drug offense in ten years, the district court sentenced him to 12 years in prison, a variance from his otherwise applicable 188-to-235-month Guidelines range. Ingram appeals his sentence on a single ground: substantive unreasonableness. The members of the panel agree that this argument fails on the merits, a conclusion that might warrant summary affirmance. Here, we proceed by published opinion because our colleague, Judge Calabresi, wishes to file a concurring opinion discoursing on various topics, including (1) the possibility that a procedural challenge not raised in this case might be supported by United, States v. Preacely, 628 F.3d 72 (2d Cir.2010); and (2) the likelihood that Ingram’s sentence, even if not substantively unreasonable, “is headed toward unreasonableness — and is, in fact, well along that road,” ante at 44. I write to explain why I concur in the decision to affirm without any such reservations.
1. There Is No Basis for Suggesting Preacely-based Procedural Error
Judge Calabresi explains that he writes separately “to call attention to a procedural challenge that has been strangely absent from this case,” and that would find support in United States v. Preacely, 628 F.3d 72, if that case were properly understood. Ante at 38. If I shared that view, I would be inclined to seek further briefing from the parties to ensure that the issue was considered in an adversarial context. In fact, I do not think this appeal presents any Preacely concerns, either as that case was actually decided or as Judge Calabresi would have it construed.
a. The Procedural Error Identified in Preacely: Judicial Misunderstanding As to the Binding Effect of Career Offender Criminal History Category VI
The procedural error identified in Preacely was the sentencing judge’s mistaken belief that he was bound to treat the career offender guideline, specifically, its assignment of a criminal history category of VI, see U.S.S.G. § 4Bl.l(b), as mandatory, despite the judge’s decision otherwise *46 to mitigate defendant’s Guidelines sentence. See United States v. Preacely, 628 F.3d at 80-81 (citing statements in which district court repeatedly emphasized defendant’s criminal history category of VI and its obligation to follow Guidelines, and concluding therefrom that “[i]t is ambiguous whether the sentencing judge understood that he was not required to treat Preacely as a ‘sixth degree offender’ and that the Career Offender Guideline was not mandatory”).[1] As Preacely observed, a Guidelines policy statement specifically recognizes a district court’s discretion to grant a within-Guidelines departure from a Guidelines criminal history category, see U.S.S.G. § 4A1.3(b)(l), even though that discretion is strictly limited in the case of career offenders, see id. § 4A1.3(b)(3) (stating that departure “may not exceed one criminal history category,” ie. from VI toV).
Ingram, like the defendant in Preacely, is a career offender who sought sentencing leniency. But, in contrast to Preacely, the record here does not support a conclusion that the sentencing judge thought that he was “required” to treat Ingram as a category VI offender or that the career offender Guideline was “mandatory.” United States v. Preacely, 628 F.3d at 80. No such inference can be drawn from the mere fact that Judge Arcara twice referenced Ingram’s criminal history category of VI. See United States v. Sero, 520 F.3d 187, 192 (2d Cir.2008) (reiterating strong presumption that district courts understand scope of their discretion to apply Guidelines departures, which may be overcome only in “rare situation” where “record provides a reviewing court with clear evidence of a substantial risk that the judge misapprehended the scope of his departure authority” (emphasis in original)). Nor was Judge Arcara required specifically to reference his § 4A1.3(b) discretion to obviate such concern. See United States v. Crosby, 397 F.3d 103, 113 (2005) (reiterating that “robotic incantations” not necessary to demonstrate district court’s proper consideration of Guidelines).
Indeed, the conclusion that this case presents no Preacely error is only reinforced by the context of the district court’s two references to Ingram’s criminal history category of VI, one in skeptical response to defense counsel’s argument that Ingram had “a substantial ability to be rehabilitated,” Sent. Tr. 5 (“With a criminal history Category of VI?”); and one in observing that Ingram’s criminal history, when considered with his age, demonstrated that he had “been involved with the law a lot,” id. at 8. Not only are these statements equally apt whether Ingram’s career history category was VI or V,[2] but also they nowhere intimate that the district court thought itself powerless to depart from category VI or the career offender guideline if circumstances warranted, the context that gave rise to concern in Preacely. See 628 F.3d at 80-81. Indeed, Judge Arcara elsewhere acknowledged that the proper application of the career offender guideline to a particular case “depends on a lot of the circumstances,” Sent. Tr. 9, a statement consistent with recognition, rather than disavowal, of the court’s authority to depart from that guideline, see generally United States v. Mishoe, 241 F.3d 214, 218 (2d Cir.2001) *47 (holding that § 4A1.3(b) departure must be based on “individualized consideration of the circumstances of a defendant’s case”). Moreover, he specifically acknowledged defense counsel’s argument that Ingram should be shown leniency because he was “not a typical career offender under the [Guidelines,” and nowhere indicated that his discretion to grant relief on that basis was in any way limited by an immutable criminal-history category. Sent. Tr. 14.
In sum, the record in this case does not admit procedural error of the sort recognized in Preacely.
b. Preacely Does Not Require Sequential Consideration of a Within-Guidelines § kAl.S Departure and a Nan-Guidelines Variance
Judge Calabresi submits that Preacely makes a “subtle but important contribution ... to our Circuit’s law regarding career offenders” by clarifying that a court’s discretion to make a horizontal departure under § 4A1.3(b) differs from its post-Booker discretion to impose a non-Guidelines sentence. Ante at 38, 39-40. From this he infers a procedural obligation for sentencing courts to apply within-Guidelines departures, or at least a § 4A1.3(b) departure, before exercising broader Booker variance discretion. I disagree.
First, it is by no means clear that the sentencing consideration afforded in Preacely was a post-Booker variance rather than a within-Guidelines departure pursuant to 18 U.S.C. § 3553(e) and U.S.S.G. § 5K1.1. See United States v. Preacely, 628 F.3d at 75. Thus, I am not convinced that Preacely considered — much less drew — the distinction between within-Guidelines departures and Guidelines variances urged by Judge Calabresi.
Second, even assuming such a distinction, it would have been significant in Preacely only because the district court’s mistaken belief that it was bound by criminal history category VI appears to have infected its exercise of any other discretion to mitigate sentence. But nowhere in Preacely did this court suggest that, even in the absence of such an infecting mistake, it would be procedural error for a sentencing court not to engage in the “doubled exercise” of discretion urged by Judge Calabresi, ante at 40, first deciding whether to grant a within-Guidelines departure, and only then, after fixing that departure, deciding whether to grant a sentencing variance.[3]
Such a rigid sequential requirement lacks support in the Supreme Court’s post-Booker precedents, which, in clarifying the expansive scope of district court discretion to sentence outside applicable Guidelines, have used the terms “departure” and “variance” interchangeably. Gall v. United States, 552 U.S. 38, 50, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007). The Court has also observed that district courts “may depart” from the Guidelines “either pursuant to the Guidelines or, since Booker, by imposing a non-Guidelines sentence,” Rita v. United States, 551 U.S. 338, 350, 127 S.Ct. 2456, 168 L.Ed.2d 203 (2007) (emphasis added). In so doing, it is not the sequence of the sentencing court’s inquiry that matters, but its demonstration of “a reasoned basis” for its sentencing decision.[4] Id. at *48 356, 127 S.Ct. 2456 (recognizing that degree of explanation required will vary with circumstances).
Even before the Supreme Court thus emphasized the enhanced flexibility of district courts’ post -Booker sentencing discretion, this court had recognized that sentencing judges were not required to resolve all Guidelines-related issues “if the judge has fairly decided to impose a non-Guidelines sentence” in any event. United States v. Crosby, 397 F.3d at 112 (referencing complex issues). Relying on Crosby, we recently summarily rejected a claim of procedural error based on the district court’s failure to consider within-Guidelines departures before opting for an above-Guidelines variance. See United States v. McGowan, 315 Fed.Appx. 338, 341-42 (2d Cir.2009) (summary order); see also United States v. Diosdado-Star, 630 F.3d 359, 362-65 (4th Cir.2011) (rejecting claim of procedural error based on district court’s failure to address within-Guidelines departure before imposing above-Guidelines sentence); cf. United States v. Simmons, 343 F.3d 72, 78-79 (2d Cir.2003) (rejecting “mechanistic, step-by-step” procedure for calculating within-Guidelines upward departures (internal quotation marks omitted)).
Judge Calabresi nevertheless suggests that a doubled exercise of discretion — first within the Guidelines and then under Booker — is warranted because (1) the Sentencing Commission favors it; and (2) the departure point for a Booker variance matters, even when courts are not bound by it. See ante at 39-41. In support of the first conclusion, he points to the Commission’s retention, even after Booker, of policy statements identifying appropriate grounds for departures. See, e.g., U.S.S.G. §§ 4A, 5K. As to the second, he cites social science literature on the human tendency to be influenced by “anchoring effects.” I find neither point convincing.
The fact that the Commission, after Booker, continues to identify grounds for possible upward and downward departures is consistent with its obligation to provide guidance to sentencing courts based on its empirical studies of thousands of sentences and its efforts to implement legislation reflecting Congress’s sentencing policies. That hardly means that courts are proee-durally required to decide whether, and to what extent, Commission-identified grounds warrant within-Guidelines departures before courts can grant a Guidelines variance.[5] Indeed, in Preacely, even though Judge Lynch recognized the use *49 fulness of giving separate consideration to departure grounds having different bases, he rejected the idea of “any mandatory sequencing of consideration of grounds for departure.” United States v. Preacely, 628 F.3d at 86 (Lynch, J., concurring).
“Anchoring effect” analysis warrants no different conclusion, particularly where, as here, the proposed “anchor” is not the applicable Guidelines range attributable to the Sentencing Commission, which district courts are required to calculate, see Gall v. United States, 552 U.S. at 49, 128 S.Ct. 586, but a within-Guidelines departure chosen by the same judge empowered to grant a Guidelines variance. Insofar as Judge Calabresi states that “a horizontal departure is a decision to shift to a new guidelines range,” and concludes therefrom that “[thereafter, a court must choose whether to depart from that new range in light of the statutory sentencing factors outlined at 18 U.S.C. § 8553(a),” ante at 39 (emphasis added), I respectfully disagree with both his premise and conclusion.
A horizontal departure does not produce a “new” applicable Guidelines range. See U.S.S.G. § 1B1.1 cmt. 1(E) (defining “departure,” for purposes of § 4A1.3, as “assignment of a criminal history category other than the otherwise applicable criminal history category,..in order to effect a sentence outside the applicable guideline range ” (emphasis added)); see also United States v. Jones, 369 Fed.Appx. 171, 172 (2d Cir.2010) (summary order) (holding .that § 4A1.3 departure does not change applicable Guidelines range but, rather, “imposes a sentence outside the calculated range” (emphasis in original)). Under the mandatory Guidelines scheme, district courts granting horizontal departures were required to select sentences within the range provided for the criminal history category to which they had departed, see United States v. Coe, 891 F.2d 405, 412-13 (2d Cir.1989); accord United States v. Tropiano, 50 F.3d 157, 162 (2d Cir.1995), which may have seemed to bind them to a “new” Guidelines range.[6] But, in fact, the applicable Guidelines range always remained as originally calculated.
Insofar as Judge Calabresi cites literature discussing how “anchoring effects” can irrationally influence human behavior, see ante at 40-41 nn. 1-2,1 fail to see how this point is relevant to whether a procedural requirement to a reasonable sentence is the sequential application of a within-Guidelines departure and a sentencing variance.[7] Rationality, rather than irrationality, is the operating presumption in affording the Sentencing Guidelines con- *50 timed consideration even after Booker, ie., (1) the Sentencing Commission rationally and responsibly identifies applicable Guidelines ranges based on its superior access to extensive empirical data and its efforts to implement sentencing legislation, see Gall v. United States, 552 U.S. at 46, 128 S.Ct. 586; and (2) sentencing courts rationally and responsibly consider applicable Guidelines ranges with the benefit of their own unique insights into a particular defendant and his crime, see id. at 50-52, 128 S.Ct. 586. Once a district court considers the applicable Guidelines range and decides not to sentence within that range, nothing in Gall, or any other controlling precedent, requires a district court to recalculate the Guidelines based on any within-Guidelines departure before considering a possible variance from that new range.
Indeed, such a doubled exercise of discretion would serve little purpose in ensuring a reasonable sentence in this case. Ingram’s counsel — in what can only be described as an exemplary sentencing memorandum — cogently and forcefully argued six reasons not to sentence defendant as a career offender. Whether these arguments were applied to a § 4A1.3 departure or a Guidelines departure, the district court would have to consider the same § 3553(a) factors. Moreover, the practical effect of requiring a § 4A1.3 departure to be considered before a sentencing variance would have been to apply a powerful brake — even if only temporarily — to the mitigation of Ingram’s career offender sentence. See U.S.S.G. § 4A1.3(b)(3)(A) (strictly limiting horizontal departure for career offenders to one criminal history category). A defense attorney seeking more consideration might well decide to appeal directly to the district court’s broad variance discretion without reminding it of the § 4A1.3(b)(3)(A) limitation — let alone its underlying rationale, see 28 U.S.C. § 994(h)(l)(2) (requiring that Guidelines ensure that career offenders serve prison sentences “at or near the [statutory] maximum”) — lest this dissuade the district court from granting the larger variance sought.[8] In any event, in the absence of any misunderstanding about the possible binding effect of a criminal history catego *51 ry of VI, as identified in Preacely, I do not see how Ingram was prejudiced by the fact that the district court failed to come to the full stop required by § 4A1.3(b)(3)(A) before proceeding to grant a sentencing variance.
In sum, there is no meritorious procedural challenge “strangely absent” from this case. Ante at 38.
2. There Is No Basis for Suggesting that the Sentence in this Case Is “Well Along” the Road to Substantive Unreasonableness
Although Judge Calabresi votes to affirm Ingram’s challenged sentence, he states that “a sentence of this length, for this crime, is headed toward unreasonableness — and is, in fact, well along that road.” Ante at 44. To explain how we can affirm a sentence that he thus decries, Judge Calabresi submits that “substantive reasonableness” is a term of art that asks not whether a sentence “makes sense,” but only whether it is “located within the range of permissible decisions” available to the district court. Ante at 37. The suggestion that a sentence can be both substantively reasonable and absurd risks calling the law into disrepute.[9]
I submit that deciding that a sentence falls within “the range of permissible de *52 cisions” qualifying as substantively reasonable necessarily decides that the sentence makes sense. As our precedents recognize, this does not engage us in a pinpoint inquiry. “Sentencing is not ... a precise science,” and “[r]arely, if ever, do the pertinent facts dictate one and only one appropriate [ie., sensible] sentence.” United States v. Jones, 531 F.3d at 174. Precisely because relevant facts frequently point in different directions, “even experienced district judges may reasonably differ, not only in their findings of fact, but in the relative weight they accord competing circumstances.” Id. Thus, “in the great majority of cases, a range of sentences ... must be considered reasonable,” ie. sensible. Id. Accordingly, when, on appeal, we “patrol the boundaries of reasonableness” to determine whether a sentence falls outside this range, United States v. Cavera, 550 F.3d at 191, we identify the few cases that, even when we accord proper deference to the district courts, cannot be said to make sense.[10]
Just as I disagree with the premise that a nonsensical sentence can be substantively reasonable, I disagree with the conclusion that Ingram’s sentence makes no sense. Judge Calabresi submits that “there is nothing ‘reasonable’ about sending a man to prison for twelve years to punish him for a non-violent, $80 drug sale.” Ante at 43 (emphasis in original). In fact, the district court did not impose a 12-year sentence to punish Ingram just for a non-violent, $80 drug sale. The totality of relevant circumstances was more complex. See 18 U.S.C. §§ 3553(a), 3661.
Ingram had a series of drug convictions and arrests spanning almost a decade. Judge Calabresi dismisses these as “brush[es] with the law.” Ante at 38. To be sure, federal judges in this circuit have seen worse crimes, indeed worse drug crimes, than those committed by Ingram. Nevertheless, “brushes” is too dismissive a term given the real recidivism and public safety concerns identified by the district court. See Sent. Tr. 13 (“Well, there’s a lot more than just one gram of cocaine [to consider]. We’ve got a whole record of being involved in dealing with drugs.”).
Indeed, the 2010 crime underlying Ingram’s instant conviction bore a disturbing similarity to his first drug felony conviction in 2003, in that each involved a pair of small-quantity crack sales to undercover officers, taking place at the very same location, Church Street and Wasson Avenue in Lackawanna, New York, the site of the Gates Public Housing Project. These facts, by themselves, suggested that a decade of almost nonstop encounters with law enforcement authorities — arrests, convictions, a total of approximately four years in prison, followed by drug treatment programs and other forms of supervision— *53 had not deterred Ingram one bit from trafficking crack. As Judge Arcara found, “[h]e made a career selling drugs to a vulnerable population in the public housing project.” Sent. Tr. 15. The conclusion was only reinforced by Ingram’s 2008 felony conviction for selling 13.6 grams of crack cocaine to an undercover officer in Woodlawn, New York, in exchange for $1,400. Meanwhile, in 2004, while on probation for his first drug conviction, Ingram was arrested by Lackawanna police who found 1/8 ounce of crack cocaine in his coat, for which conduct Ingram pleaded guilty to attempted possession.[11] Then in 2006, Ingram was arrested for various traffic violations and found in possession of $1,493.84, strongly suggesting continued drug trafficking given his lack of lawful employment.
Judge Arcara viewed Ingram’s continued sale of crack in public housing as a particularly aggravating circumstance. This was not simply because Congress generally views such trafficking as aggravating. See 21 U.S.C. § 860(a) (doubling statutory maximum sentence for drug distribution within 1,000 feet of public housing). It was because, during previous parole terms, the Lackawanna Municipal Housing Authority had allowed Ingram to reside in public housing to maintain a stable family relationship with his wife and children, despite the fact that his drug crimes rendered him ineligible.[12] Judge Arcara was “amaze[d]” that, rather than availing himself of this consideration to secure employment and provide for his family, Ingram had not only failed to do either, but also reestablished his drug business on public housing property. Sent. Tr. 26.
Judge Arcara also viewed the public housing population to which Ingram trafficked as particularly vulnerable. Not only were Ingram’s immediate customers likely to become dependent on drugs, but that dependency would also have serious collateral consequences for their families and neighbors insofar as drug trafficking frequently spawns other criminal activity, sometimes violent, from which persons with few if any other housing options could hardly escape.
On this record, even defense counsel recognized that no district judge would be inclined to sentence Ingram to a prison term between 21 and 27 months, his Guidelines range before application of the career criminal offender enhancement. Ingram’s counsel urged a sentence of eight years. The question before us is not whether an eight-year prison term was the most appropriate sentence. It is whether a 12-year term was outside the range of sentencing decisions reasonably available to the district court, so as to render Ingram’s sentence substantively unreasonable. When the crime of conviction is considered in light of the aggravating circumstances just summarized, the answer to that question, as the panel recognizes, must be no. But further, these aggravating circumstances require me to take exception to my colleague’s conclusion that the challenged sentence in this case was “headed toward unreasonableness,” much less “well along that road.”
Accordingly, I concur in the court’s decision to affirm Ingram’s judgment of con *54 viction because there is no merit to his substantive unreasonableness challenge and because I do not share Judge Calabre-si’s Preacely-derived procedural concerns.

. As the dissenter in Preacely, I disagreed with the majority’s identification of procedural error, and I continue to think that the case was wrongly decided for the reasons stated in my opinion. See id. at 86 (Raggi, J., dissenting). Nevertheless, I recognize that Preacely is controlling precedent.

. Ingram's criminal history category was V even without a career offender enhancement.

. As these two points make clear, I write not to express continuing disagreement with Preacely, as Judge Calabresi suggests, see ante at 42 n. 5, but rather to show that Preacely never considered, and certainly never announced, the doubled-exercise-of-discretion requirement that Judge Calabresi purports to discover there, see ante at 39-42.

. The Supreme Court has since recognized that “ ‘[departure’ is a term of art under the Guidelines and refers only to non-Guidelines *48 sentences imposed under the framework set out in the Guidelines.” Irizarry v. United States, 553 U.S. 708, 714, 128 S.Ct. 2198, 171 L.Ed.2d 28 (2008) (holding that Fed. R.Crim.P. 32(h) applies only to departures, not variances). Nevertheless, Gall and Rita signal that the Court has by no means conditioned the exercise of variance discretion on a preceding exercise of any possible departure discretion.

. While the Commission has recommended that Congress require district courts to “evaluate departures within the Guidelines and only then consider the § 3553(a) factors,” U.S.S.C., Report on the Continuing Impact of United States v. Booker on Federal Sentencing 114 (Dec. 2012), in the absence of such legislation, I am not inclined to recognize such a procedural requirement. To the extent the Commission’s recommendation implies that within-Guidelines departures can be decided without reference to § 3553(a) factors, I respectfully disagree. Virtually every within-Guidelines departure decision is informed by one or more § 3553(a) factors. Further, insofar as the Commission's post-Booker recommendations are animated by a belief that Congress should "statutorily require district courts to give 'substantial weight’ to the guidelines,” id., courts should proceed cautiously before endorsing them, see generally Kimbrough v. United States, 552 U.S. 85, 113-14, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007) (Scalia, J., concurring) (cautioning that anything that puts "thumb on the scales” in favor *49 of Guidelines sentence raises Sixth Amendment concerns).

. Originally, this process required district courts to proceed sequentially from one criminal history category to the next, a requirement never imposed on vertical departures. See United States v. Tropiano, 50 F.3d at 162-63. That sequential process was soon recognized to be "rigid and mechanistic,” id. at 162, and we increasingly excused sentencing courts from strict adherence to it as long as they adequately explained the reasons for a horizontal departure, see United States v. Simmons, 343 F.3d at 78.

. I am particularly perplexed by the conclusion Judge Calabresi draws from one such article: that "judges have been shown ... to be influenced by prosecution requests” for particular sentences — the purported "anchor” — not only when they think the prosecutor is committed to securing justice, but when the judge knows the prosecutor’s sentencing recommendations “were randomly generated." Ante at 41 n. 2 (citing Birte Eng-lich, Thomas Mussweiler & Fritz Strack, Playing Dice with Criminal Sentences: The Influence of Irrelevant Anchors on Experts’ Judicial Decision Making, 32 Personality & Soc. Psychol. Bull. 188 (2006) (showing effect of rolled dice on German judges’ sentencing choices) (emphasis in original)). The article supporting this extraordinary view of sentencing judges is based on studies involv *50 ing only hypothetical sentencing scenarios. As any judge with sentencing experience knows, a wide chasm separates the making of decisions that really deprive another person of liberty from the making of hypothetical decisions that do not, rendering analogies suspect. Further, while my familiarity with the administration of criminal justice east of the Rhine is limited, my direct experience with that same subject in the district courts of the Second Circuit spans more than three decades. During that time, I have never known a federal prosecutor in this circuit to submit a “randomly generated” sentencing recommendation to a district court. More to the point, I have never known a district judge to allow him- or herself "to be influenced by prosecution [sentencing] requests which [the judge] knew were randomly generated." Ante at 41 n. 2 (emphasis in original). To the extent district judges have been “influenced” by properly generated prosecution sentencing recommendations, they have also been “influenced” by properly generated defense recommendations. This is contemplated, rather than prohibited, by law. See Fed.R.Crim.P. 32(i)(l)(c). Moreover, such recommendations are almost invariably submitted with supporting reasons, and thus their weight depends on the persuasiveness of those reasons.

. Thus, I would not fault defense counsel for failing to cite § 4A1.3(b) or our decision in Preacely to the district court. See ante at 37-38. Indeed, any experienced defense counsel would recognize that Ingram would not compare favorably with the Preacely defendant. While the latter may have sold more crack than Ingram and had more prior convictions, ante at 41-42, he also had undergone an extraordinary rehabilitation prior to sentencing, overcoming his drug addiction, securing gainful employment, supporting his wife and child, and serving as a youth advisor for a gang prevention program. Further, he had rendered significant assistance to law enforcement authorities in solving two murders, *51 apprehending a fugitive, and securing arrests or convictions of persons involved in drug dealing, firearms trafficking, credit card fraud, and multiple robberies. See United States v. Preacely, 628 F.3d at 77. By contrast, by the time of his sentencing, Ingram could show no actual rehabilitation from the pattern of drug dealing, drug addiction, and lack of lawful employment or family support that had characterized the whole of his adult life despite various assistance programs made available to him during many earlier periods of court supervision. He could only profess an intent to rehabilitate himself in the future, something the district court was entitled to view with skepticism. See id. at 85 (Lynch, J. concurring) (observing that "[o]nce caught, every criminal knows that it is time to feign remorse and rehabilitation, and every judge has seen many defendants who do exactly that”).

. Judge Calabresi acknowledges this concern. Nevertheless, he admits such a possibility because sentencing choices are sometimes dictated by Congress: “The legislature tells judges that we must do certain things in regard to sentencing, and the legislature’s judgment thereby defines what sentences lie within the pale.” Ante at 43 n. 9. Judge Cal-abresi submits that, although such sentences “cannot be found substantively unreasonable without infringing on the prerogative of the legislature,” judges may appropriately tell Congress that its choices are "mistaken, even absurd.” Ante at 44 n. 9. I respectfully suggest that this reasoning is more confusing than helpful to our substantive reasonableness jurisprudence.
First, while substantive reasonableness review is highly deferential, it is not so limited that courts "cannot” find unreasonable a sentence within a legislatively prescribed range. See, e.g., United States v. Dorvee, 616 F.3d 174, 188 (2d Cir.2010) (finding sentence at statutory maximum substantively unreasonable).Thus, the fact that Congress plays a role in dictating sentencing ranges cannot justify holding a sentence both substantively reasonable and absurd.
Second, after Booker, Congress constrains courts’ sentencing discretion only insofar as it enacts mandatory minimum and maximum sentences. Here, Congress dictated that Ingram be incarcerated for no less than one and no more than 40 years. See 21 U.S.C. § 860(a). It was the district judge who chose the challenged 12-year sentence — well removed from either the mandated minimum or maximum. In these circumstances, holding that sentence substantively reasonable while decrying it as absurd, says almost nothing to Congress and certainly does not avoid calling the law into disrepute.
A final point: my colleague identifies sentencing absurdity in Congress’s "tell[ing] judges that repeated small-scale drug transactions should be punished more severely than rape,” ante at 44 n. 9. The conclusion is more inflammatory than accurate as applied to this case. Compare N.Y. Penal Law § 70.02 (prescribing five-year minimum and *52 25-year maximum prison term for first-degree rape) with 21 U.S.C. § 841(b)(1)(C) (providing for prison term of zero to 20 years for trafficking in less than 28 grams, or unspecified quantity, of crack); id. § 860(a) (prescribing minimum sentence of one year and doubling § 841(b) maximum for drug trafficking within 100 feet of school or public housing facility).

. The fact that we rarely encounter substantively unreasonable sentences reflects not a defect in our jurisprudence, see ante at 43-44, but the conscientiousness of district judges in exercising their sentencing responsibilities. Indeed, in Gall, the Supreme Court emphasized that district courts have two advantages warranting general deference to their sentencing decisions: (1) their experience imposing scores of sentences each year, and (2) their unique ability to observe the defendant and to resolve factual disputes relevant to sentencing. See Gall v. United States, 552 U.S. at 51, 128 S.Ct. 586 (observing that district courts thereby gain "insights not conveyed by the record” that are often critical to identifying a just sentence (internal quotation marks omitted)).

. This New York class E felony was not a basis for treating Ingram as a career offender. At the time of this arrest, 25 bags of crack cocaine were also found on the ground nearby, but Ingram was not charged with these drugs.

. At the time of the instant offense, the Housing Authority was no longer granting Ingram this consideration. Instead, he was living in public housing without authorization.